# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 17-cr-00018-PAB

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. TSVETAN KANEV,

    Defendant.

---

## PLEA AGREEMENT

---

The United States of America, by and through Julia Martinez, Assistant United States Attorney, and defendant, TSVETAN KANEV, personally and through counsel, Edward R. Harris, Assistant Federal Public Defender, submit the following Plea Agreement.

### I. **PLEA AGREEMENT**

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties understand that any recommendations that a particular sentence or sentencing range be imposed pursuant to this Plea Agreement is not binding on the court.

A. **Defendant's Obligations**

    1. **Count of Conviction**

The defendant agrees to plead guilty to Count One of the Indictment charging a violation of 50 U.S.C. § 1705, Violation of the International Emergency Economic Powers Act.

2. **Waiver of Appeal**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided in the statute of conviction; (2) the sentence exceeds the advisory Guidelines range applicable to an offense level of 23; or (3) the government appeals the sentence imposed. If any of these three criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the defendant was deprived of the effective assistance of counsel; or (3) the defendant was prejudiced by prosecutorial misconduct. Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement.

3. **Forfeiture of Assets**

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §

981(a)(1)(C) and/or 28 U.S.C. § 2461(c), whether in the possession or control of the United States or in the possession or control of the defendant or defendant's nominees, or elsewhere. The assets to be forfeited specifically include, but are not limited to, the money wired by the defendant to any undercover government bank account during the course of the investigation, including funds in the amount of $359,260.92.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action. The defendant also hereby agrees that the forfeiture described herein is not excessive and, in any event, the defendant waives any constitutional claims that the defendant may have.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis to establish that the requisite nexus exists between the specific property subject to forfeiture and the offenses to which defendant is pleading guilty.

In addition to forfeiture, the defendant further agrees to relinquish all claim, title and interest defendant has in the property listed in this section seized from the defendant to the United States.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

B. **Government's Obligations**

1. **Dismissal of Charge**

If the defendant enters an unconditional plea of guilty to Count One of the Indictment and

otherwise fulfills all obligations outlined above, the government will dismiss Counts Two and Three of the Indictment and agrees not to charge the defendant with any other violations of law now known to the United States Attorney's Office for the District of Colorado.

2. **Acceptance of Responsibility**

If the defendant engages in no conduct that otherwise implicates § 3C1.1, the government agrees that a 3-point reduction in the offense level for acceptance of responsibility, pursuant to § 3E1.1, is appropriate and agrees to make the appropriate motion at sentencing.

## II. ELEMENTS OF THE OFFENSE

The parties agree that the elements of the offenses to which this plea is being tendered are as follows. The elements of 50 U.S.C. § 1705, Violation of the International Emergency Economic Powers Act, are as follows:

*One*: The defendant knowingly attempted to export from the United States items described in the indictment;

*Two*: The items required a license from the U.S. Department of Commerce for export;

*Three:* The defendant did not obtain a license;

*Four*: The defendant acted willfully.

## III. STATUTORY PENALTIES

The statutory penalty for a violation of 50 U.S.C. § 1705, as charged in Count One of the Indictment is not more than 20 years of imprisonment, not more than a $1,000,000 fine, or both, not more than three years of supervised release, and a $100 special assessment.

4

## IV. COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including but not limited to the right to possess firearms, vote, hold elected office, and to serve on a jury. If the defendant is an alien, the conviction may cause the defendant to be deported and removed from the United States or confined indefinitely if there is no country to which the defendant may be deported, to be denied admission to the United States in the future, and to be denied citizenship.

## V. STIPULATION OF FACTS

The parties agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to this Plea Agreement. That basis is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offenses of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the Plea Agreement.

The statement of facts herein does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein, which do not contradict the facts to which the parties have stipulated, and which are relevant to the guideline computation under § 1B1.3, or to the sentencing factors found in § 1B1.4, 18 U.S.C. § 3553(a), or to this Court's overall sentencing decision. In "determining the factual basis for the sentence, the Court will consider the stipulation of the parties, together with the results of the presentence investigation, and any other relevant information." § 6B1.4 Comm.

The parties stipulate to the following facts:

*IEEPA and the EAR*

Under the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law. Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. See 15 C.F.R. § 730.2. In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period

covered by that Executive Order through the present.  See, e.g., 81 Fed. Reg. 52,587 (Aug. 8, 2016).

Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items.  15 C.F.R. §§ 734.2-.3.  In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control requirements depending on destination, end use, and end user.

Certain clock drivers and static random access memory multi-chip modules discussed below were listed on the CCL and categorized under ECCN 9A515.  Certain analog-to-digital converters discussed below were listed on the CCL and categorized under ECCN 3A001.  Under the EAR, a BIS license was required to export these items from the United States to Russia.

*The Defendant*

At all times relevant to the Indictment, the defendant TSVETAN KANEV ("KANEV"), a citizen of Bulgaria, was the owner and proprietor of VEKA, Ltd., a small company based in Sofia, Bulgaria, which employed a number of individuals.

*The Offense*

Beginning as early as August 2015, and continuing through June 2016, KANEV unlawfully and willfully attempted to export and caused to be exported from the United States to Russia items without a license, in violation of U.S. export laws and regulations.

In August of 2015, KANEV sent an email to Company A, a U.S. manufacturer of radiation hardened integrated circuits commonly used in satellites, requesting a quote for five different parts in various quantities. In the email correspondence, KANEV identified himself as Tsvetan KANEV, representing VEKA Ltd. in Bulgaria. All five of the parts for which KANEV requested a quote were determined to be export controlled by the Department of Commerce (DOC) under ECCN 9A515, meaning an export license may be required depending on the country of ultimate end use. According to the EAR, an export license approved by the DOC is required to export or re-export commodities classified as 9A515 to Russia.

Company A requested the end user information to comply with U.S. export regulations. KANEV replied the end user was the Bulgarian Academy of Science and the end use application was a project called the Information Complex for Aerospace Monitoring of the Environment. KANEV added that the parts may be shipped to another country from Bulgaria for them to be mounted on a plastic circuit board. KANEV provided the name of a company in Finland, INTERTRANSLOG OY, as that possible company. Company A advised KANEV that another

company, an HSI undercover platform, would be made aware of his request for quote and may be able to assist in processing his order.

On or about August 20, 2015, KANEV sent an email to the HSI undercover platform with the same request for quote which had been sent to Company A. On or about August 24, 2015, HSI undercover agents replied to KANEV's email explaining that the parts he was requesting were export controlled requiring licenses from the Department of Commerce and that an end user statement would be needed. KANEV completed the end user statement listing VEKA as the consignee and INTERTRANSLOG OY as the end user. KANEV requested the Skype ID of undercover agents.

On or about August 25, 2015, undercover agents received a Skype contact request from KANEV. KANEV's Skype ID was shown as "esyceco." On or about August 28, 2015, during a Skype conversation between undercover agents and the KANEV, undercover agents explained that if the parts are not for Bulgaria "then we could be in trouble for lying on the export application." KANEV replied stating he knew and did not want to be on any list denying him the ability to do business with companies in the United States. KANEV explained that some of the parts will be used in Bulgaria but some may also go to Russia. KANEV then admitted the budget for the space program in Bulgaria is not very large. KANEV requested a quote for other space electronics from another company and stated they were for Russia.

On or about September 30, 2015, during a Skype chat conversation between undercover agents and the KANEV, undercover agents explained "if want to provide us with your Russian end user, we can try and get a license that way. Or if your end user wishes to remain anonymous and you just want to submit the end user as Bulgaria…." KANEV requested undercover agents

to "prepare all docs for anounimus [sic] end user (i think this we be faster way)." KANEV also stated an additional amount can be added to the total price of the parts for "this service"; meaning the submission of the false end user. Undercover agents and KANEV agreed to a 25% down payment to start the order.

On or about October 1, 2015, during a Skype conversation between undercover agents and KANEV, undercover agents explained that the undercover agents and KANEV are all responsible for falsifying any paperwork or statements which is against the law and that even if the parts legally made their way to Bulgaria, it would still be illegal to send the parts to Russia. KANEV replied stating he has connections with both the Bulgarian and Russian military and space companies and that he is willing to pay extra because of the risk involved. KANEV explained that "by the documents you can send to me something that is not so strictly controlled, and on different price." Through this explanation KANEV was suggesting that, in order to evade U.S. reporting requirements, undercover agents could create transaction documents falsely stating that non-export-controlled items were being exported and that these items could be listed with a much lower price valuation. KANEV also added he can pay the difference for preparing any false documents.

In or about October 2015, KANEV confirmed his first order with the undercover agents. The order consisted of three of the original five parts from Company A and included an extra fee of approximately $25,172.00 USD as payment to the undercover agents for the risk involved in illegally exporting the parts. The total of the order was $234,938.00 USD.

All three of the parts KANEV ordered were classified as ECCN 9A515 by DOC: a clock driver, with part number UT7R995-XCC; and static random access memory programmable

multi-chip modules with part numbers UT8R1M39 and UT8R512K8.  Under the EAR, a license was required to export these items from the United States to Russia.

Beginning in October 2015, KANEV wired four separate payments, totaling $236,937.92 USD, to an undercover bank account for this order.  KANEV later explained that he received the money from his Russian customer, not directly though, and due to banking laws in Bulgaria, could not wire the total amount at once but would have to send separate smaller payments.

On or about October 6, 2015, KANEV sent a Skype message to undercover agents requesting a quote for a part from Company B with a target price of $35,000 each.  KANEV stated it was for a customer in Russia and explained that Russians are unhappy about the issues in Ukraine and the increased restrictions against them.  KANEV added that "we have to act fast and carufull [sic] to get a bigger portion and not to be caught." Undercover agents replied with pricing information for the part and asked if this part is for Russia as well and that it has the same export controls (ECCN 9A515) as the other parts.   KANEV replied "… yes.  Same customer, false statement."

During another Skype conversation between undercover agents and KANEV, KANEV explained that his customer in Russia had about 10 companies that supplied components and that it was all driven by a military general's daughter.  KANEV added that he was the supplier of those 10 companies and that his Russian boss knew that the parts KANEV was attempting to procure were under special "regulation and not everyone can deliver them."  KANEV asked undercover agents if it would be possible to send quotes via email instead of Skype and added "I can open an mail box in Bulgarian or ru free mail site.. no way to trace." KANEV proceeded to

open an email account for the undercover agents on a Bulgarian server using the website www.mail.bg and sent the login information and password to the undercover agents.

On or about November 13, 2015, during a Skype conversation with undercover agents, KANEV stated that an order would be placed regarding a second order in the beginning of December. KANEV stated he saw the purchase order but he would not place it until the money was in his account. KANEV added that "there are a lot of restrictions and my customer can pay only in a small portions. so they have to 'export' money out of ru, then send them to me, than I will place po with you."

On or about November 19, 2015, during a Skype conversation with undercover agents, KANEV asked if when the parts were sent and what part numbers and price would be listed on the invoice. KANEV offered "for example: you can mention only the generic part numbers, without 5962R…and you can divide the price of the part (let's say 1/10 of real price) and separate invoice…." Undercover agents said that could be done and asked KANEV if he had received parts like that before. KANEV replied "Yes, parts with small invoice send via DHL, no 5962R numbers in it.., no customs problems."

On or about December 14, 2015, undercover agents sent a Skype message to KANEV asking about the end user statement for the second order of parts. Undercover agents explained that the parts were export controlled from United States either under ECCN 3A001 or 9A515 and would need export licenses from the Department of Commerce to be legally exported to Russia like the first order. KANEV replied that he did not want his name or his company's name mentioned anywhere and that he did "not need this parts to export to ru officially." KANEV added that the total invoice could just be for $2,944.70 and if an export license can be obtained

without end user documents it would be helpful. Undercover agents replied "But, again, please understand that just because they may not need an export license to go to Bulgaria, they would need one if the ultimate end destination is Russia. So, there is still a risk." KANEV replied "I will not export to ru officially, by the docs they are going to Finland. parts will arrive in ru in suitcase – no official docs for it. my ru customer will never know from where and how I get this parts. Officially i do not receive any money from Ru. and no docs, bank transfers or any connection with ru."

Undercover agents explained that likely no export license would be needed to send the parts to Bulgaria but for parts that are valued over $2,500.00 USD a Shippers Export Declaration must be filed for export detailing what the parts were, who they were from and where they were going. KANEV replied to send the parts to Bulgaria and to value the shipment at under $2,500.00 USD. KANEV asked that the undercover agents ensure the parts could leave the United States without any problems.

On December 9, 2015, undercover agents conducted a meeting with KANEV at the Munich International Airport, Germany. Undercover agents discussed the current status of the first order with KANEV. KANEV explained that all his orders were for Russia, some for the space program and some for the military. KANEV reaffirmed his knowledge that the parts would require an export license for Russia and that the orders were being done in such a way to evade that requirement, which included transshipping through Bulgaria and Finland then to Russia. KANEV also confirmed he would place a second order with the undercover agents.

KANEV advised he had been buying and selling electronic parts for over 12 years. It took two years for KANEV to get a contract with the Russians when he first started trying to

13

transship restricted parts to them. KANEV stated he grew up in a Russian school in Bulgaria and speaks Russian along with Bulgarian and English. KANEV added that the Russians went through all the documentation for his company and thoroughly vetted him in order to start placing additional orders.

KANEV requested the undercover agents falsify all shipping documents when the first order was shipped to him. KANEV advised to label the parts something which is similar but does not have the export restrictions. KANEV also explained to value the parts much less than their actual value as it would also help him to pay lower taxes and fees with Bulgarian Customs. KANEV stated that international banking helps him hide the money trail from his restricted parts transactions. KANEV explained that the money he made on these transactions in excess of what the falsified documents show was hidden through a Hong Kong bank account.

On or about December 14, 2015, KANEV sent a purchase order via the Bulgarian email. The purchase order was for the parts listed on the second Pro Forma invoice sent by undercover agents on or about November 10, 2015 and was for a total of $294,470.62 USD which included the undercover agents fee of $31,550.42 USD for falsifying paperwork.

On or about December 14, 2015, during a Skype conversation between undercover agents and KANEV, undercover agents asked about the end user statement for a possible second order of parts discussed previously. Undercover agents explained that the parts were export controlled from United States and would need export licenses from the Department of Commerce to be legally exported to Russia like the first order. KANEV replied that he did not want his or his company's name mentioned anywhere and that he did "not need this parts to export to ru officially." KANEV added that the total invoice could just be for $2,944.70 and if an export

license could be obtained without end user documents it would be helpful. Undercover agents explained that most of the parts may not need an export license to go to Bulgaria, but would still require one to Russia and that a Shippers Export Declaration must be filed for any shipments valued over $2,500. KANEV replied instructing the undercover agents to value any shipments under that amount and ship directly to Bulgaria. KANEV explained that once he received the parts, he would send them to the company in Finland and that eventually the parts would arrive in Russia in a suitcase and there would be no official export documents showing the part went to Russia.

Also on December 14, 2015, KANEV confirmed his Second Purchase Order of parts containing various parts from multiple manufacturers. The total order, including the extra fee, was for approximately $294,470.62. One part in the order, a multiple analog-to-digital converter ADS5444/MHFG-V, was controlled under ECCN 3A001 and required an license to export to Russia. As part of the Second Purchase Order, KANEV subsequently wired two payments to the undercover bank account totaling approximately $122,323.00 USD.

On June 2, 2016, undercover agents conducted a meeting with KANEV at a hotel in Stockholm, Sweden. During the meeting KANEV stated he was aware his attempts to export controlled parts without a license from the United States was against the law.

The acts taken by KANEV in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law and were not committed by mistake, accident, or other innocent reason.

## VI. ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18

15

U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the government sets forth below its estimate of the advisory guideline range called for by the United States Sentencing Guidelines.

The Guideline calculation below is the good-faith estimate of the government's, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may make legal or factual arguments that affect the estimate below.

**Offense Level**:

A. Under § 2M5.1(a)(1), the base offense level for this offense is **26**.

B. No role-in-offense or obstruction adjustments apply.

C. Defendant should receive a decrease in the offense level by **-2** based upon his acceptance of responsibility. § 3E1.1(a). Defendant should also receive a decrease in the offense level by **–1** for timely notifying the government. § 3E1.1(b). At sentencing, the government will make the appropriate motion for the one-point reduction.

D. The parties agree adjusted offense level is **23**.

**Criminal History Category**

E. The parties acknowledge and agree that the estimation regarding Defendant's criminal history is tentative. Defendant acknowledges that the criminal history will be further investigated by the United States Probation Department and ultimately determined by the Court. Defendant further acknowledges that any additional facts regarding the criminal history can greatly affect the final guideline range and result in a longer term of imprisonment. Based upon the facts known at this time regarding Defendant's criminal history, the parties believe that Defendant falls within Criminal History Category ("CHC") **I**. § 4A1.1.

**Guideline Ranges**

F. The guideline range resulting from the estimated offense level of **23** and the estimated

criminal history category of **I** is **46** to **57** months of imprisonment. However, the imprisonment range for offense level 23 could be from **46** months (bottom of CHC I) to **115** months (top of CHC VI).

G. Pursuant to § 5E1.2, assuming the estimated offense level of **23**, the fine range for this offense would be $20,000 to $200,000, plus applicable interest and penalties.

H. Pursuant to 18 U.S.C. § 3583(b)(1) and § 5D1.2(a)(1), if the Court imposes the term of supervised release, that term shall be at least 2 years but not more than 5 years.

The parties understand that although the Court will consider the government's estimate, the Court must make its own determination of the Guideline range. In doing so, the Court is not bound by the position of any party.

No estimate regarding the Guideline range precludes either party from asking the Court, within the overall context of the Guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the guidelines or that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate regarding the guideline range precludes either party from asking the Court to vary entirely from the advisory Guidelines and to impose a non-guideline sentence based on other 18 U.S.C. § 3553 factors.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII. **ENTIRE AGREEMENT**

This document states the parties' entire agreement. There are no other promises, agreements, (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the government nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

Date: 3/3/2021

_____
Tsvetan Kanev
Defendant

Date: 3/3/2021

s/ Edward R. Harris
_____
Edward R. Harris
Attorney for Defendant

Date: 3/3/2021

s/ Julia Martinez
_____
Julia Martinez
Assistant U.S. Attorney